# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Central Valley School District,     :
                        Appellant     :
                                 :
             v.                :     No. 1323 C.D. 2021
                                 :     SUBMITTED: October 11, 2022
Central Valley Education Association,  :
PSEA/NEA                          :


BEFORE:    HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE LORI A. DUMAS, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**SENIOR JUDGE LEADBETTER**                 **FILED: November 7, 2022**


Central Valley School District appeals from an order of the Court of Common Pleas of Beaver County denying the District's petition to vacate the arbitration award that sustained the grievance of Rebecca Hall and reinstated Hall to her teaching position with the District. Based on our limited and highly deferential standard of review, we affirm.

The facts as determined by the arbitrator are as follows.[1] In the fall of 2019, Hall was a third grade teacher at Todd Lane Elementary School in Monaca,

---

[1] It is well established that an "arbitrator is authorized to make findings of fact to inform his interpretation of the [collective bargaining agreement]." *Millcreek Twp. Sch. Dist. v. Millcreek Twp. Educ. Support Pers. Ass'n*, 210 A.3d 993, 1006 (Pa. 2019). "An arbitrator's findings of fact are not reviewable on appeal, and as long as he has arguably construed or applied the collective bargaining agreement, an appellate court may not second-guess his findings of fact or interpretation." *Coatesville Area Sch. Dist. v. Coatesville Area Teachers' Ass'n/Pa. State Educ. Ass'n*, 978 A.2d 413, 415 n.2 (Pa. Cmwlth. 2009). *See also Millcreek*, 210 A.3d at 1014.

Pennsylvania, and had been employed by the District or one of its predecessors for over 15 years. On or about October 20, 2019, the District became aware of a video posted to the social media platform TikTok in which Hall appeared with her minor daughter, a ninth grade student in the District at the time. The video lasted approximately 15 seconds and was accompanied by a song with explicit lyrics, including several offensive words and referencing a sexual act. Hall can be seen at two separate points in the video lip-syncing several lines of the song and using "suggestive hand and body motions." Original Record (O.R.), Statement of Charges, at 544. It is undisputed that the video was recorded while Hall was off duty in her home, it was not made using any District equipment, and there is nothing in the video identifying Hall as a District employee or utilizing any indicia of the District. It is further undisputed that Hall instructed her daughter not to post the video to social media after it was filmed. Once Hall learned that her daughter had, in fact, posted the video to TikTok, Hall told her daughter to remove it but failed to take affirmative steps to ensure its immediate removal.

Hall was provided a *Loudermill* hearing,[2] after which she was suspended without pay effective November 1, 2019. The District subsequently issued a Statement of Charges formally charging Hall with immorality, incompetency, intemperance, and willful neglect of duties in violation of Section 1122(a) of the Public School Code of 1949 (School Code)[3] based upon her appearance in the TikTok video. The Statement of Charges explained:

---

[2] Under *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), "due process requires that a public employee must receive a pre-termination hearing." *Bonatesta v. N. Cambria Sch. Dist.*, 48 A.3d 552, 554 n.3 (Pa. Cmwlth. 2012).

[3] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. § 11-1122(a). That section provides, in pertinent part:
**(Footnote continued on next page…)**

2

> You engaged in such unacceptable and outrageous behavior when you engaged in the above referenced inappropriate conduct, which was widely disseminated to the general school community, which has cast the [] District and yourself in a negative light and portrayed yourself as a negative role model for the students and families of the [] District based upon your conduct and behavior described herein.

O.R., Statement of Charges, at 545. The Statement of Charges also notified Hall that the District would recommend to the District Board of School Directors that she be dismissed from her teaching position. The School Board voted unanimously to terminate Hall's employment at its next meeting, and a Termination Notice was issued to Hall on December 9, 2019.

The Association filed a grievance on Hall's behalf alleging that the District violated the parties' collective bargaining agreement (CBA) by suspending her without pay and subsequently terminating her employment without just cause. The case proceeded to arbitration with hearings spanning multiple days, during which both parties presented the testimony of multiple witnesses. Notably, the District presented testimony from the following witnesses, all of whom were District employees: Sam Cercone, the District's Director of Athletics and Transportation; Shawn McCreary, the High School Principal; Edward Eimiller, the District's

---

> The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employe shall be immorality; incompetency; unsatisfactory teaching performance . . . ; intemperance; cruelty; persistent negligence in the performance of duties; wilful neglect of duties; . . . on the part of the professional employe[] . . . .

*Id.*

Director of Technology; Christina Feragotti, the Principal of Todd Lane Elementary School where Hall worked; Erin Park, the District's Special Education Director; and Dr. Nicholas Perry, the District's Superintendent. All of the District's witnesses testified that they believed Hall's actions with respect to the TikTok video offended the morals of the community. Hall testified on her own behalf, as did her daughter. In addition, three of Hall's friends testified that they were not offended by the video and/or that they had no concerns about Hall's ability to serve as a positive role model following the video. Notably, two of Hall's witnesses had lived in the District for approximately 20 years.

The arbitrator issued an opinion and award on April 16, 2021, recounting in extensive detail the testimony of each of the above witnesses. The arbitrator ultimately found that the District did not establish just cause for Hall's suspension and termination and, therefore, sustained the grievance. More specifically, he found that the District failed to meet its burden of establishing that Hall's actions offended the morals of the community, a requirement for the charge of immorality under Section 1122(a) of the School Code. The arbitrator noted that the only witnesses to testify on behalf of the District were its own employees, such as administrators and teachers, rather than members of the School Board who are elected by the community. Further, the arbitrator stressed that the District failed to demonstrate that the video was widely disseminated in the community and that it never would have been viewed absent the actions of Hall's daughter, whom he described as presenting "a nonchalant or indifferent attitude toward her mother's wishes and interests" at the hearing. Reproduced Record at 99a. He noted that while Hall's participation in the video may have been inappropriate or unprofessional, this was not enough to demonstrate a violation of Section 1122(a) of the School Code.

4

The Award reinstated Hall to her position as a teacher with the District and directed that she be made whole for all lost earnings, seniority, and benefits.

The District then petitioned the trial court to vacate the award setting forth 15 bases for vacation, including that the arbitrator's decision: does not reflect a proper interpretation of the CBA; incorrectly applies the CBA's definition of just cause; does not satisfy the essence test; and is contrary to law because it creates a new standard for immorality. In its October 25, 2021, opinion, the trial court specified that it did not agree with the arbitrator's holding that the District had not presented substantial evidence of the moral values of the community because its witnesses all held administrative positions in the District and, specifically, that it failed to call any School Board members to testify. Nonetheless, the trial court found substantial evidence to support the arbitrator's determination based on the lack of wide distribution of the video or publicity or community controversy surrounding it, and the fact that nothing in the video could connect the participants with the district or identify Hall as a teacher. We agree with this analysis. Simply put, it is not enough to prove that an act was committed which had the *theoretical potential* to offend community standards or to have a bad influence on students. Rather, the act must be done in such a circumstance as to pose a significant likelihood of doing so.[4]

---

[4] It is undisputed that to establish a charge of immorality under Section 1122(a) of the School Code, a district must prove "(1) that the alleged immoral act actually occurred; (2) that the act offends the morals of the community; and (3) that the act sets a bad example for students." *Sch. Dist. of Phila. v. Jones*, 139 A.3d 358, 365 (Pa. Cmwlth. 2016) [quoting *McFerren v. Farrell Area Sch. Dist.*, 993 A.2d 344, 353-54 (Pa. Cmwlth. 2010)]. Like the trial court, we interpret the arbitrator's determination as a finding that the video, because of its very limited dissemination, did not, in fact, offend the community or set a bad example for students. As noted above, we are bound by the factual findings of the arbitrator. Here, both the trial court and the arbitrator stressed that while Hall participated in the filming of the video, she did so within her own home; she did not identify herself as an employee of the District nor was any indicia of the District used or seen **(Footnote continued on next page…)**

Stressing the deferential standard of review in grievance arbitration matters, the trial court denied the District's petition to vacate.

On appeal to this Court,[5] the District argues that the trial court erred in refusing to vacate the award because (1) the award fails to draw its essence from the terms of the CBA and is not a rational interpretation of the CBA; (2) the arbitrator failed to properly apply the negotiated and defined just cause provision of the CBA; and (3) the arbitrator's opinion and award created a new standard and requirements for a school district to prove a charge of immorality under the School Code.

Because the trial court ably addressed the District's claims we affirm based on the well written opinion of the Honorable James J. Ross.

 

 

**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita

 

Judge Wallace did not participate in the decision for this case.

---

in the video; Hall specifically instructed her daughter not to post the video to social media; and the video never would have been seen if Hall's daughter had obeyed her wishes.

[5] In its brief the District specifies that its appeal is limited to issues surrounding the charge of immorality. District's Br. at 11.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Central Valley School District, | : | |
| Appellant | : | |
| | : | |
| v. | : | No. 1323 C.D. 2021 |
| | : | |
| Central Valley Education Association, | : | |
| PSEA/NEA | : | |

# **O R D E R**

AND NOW, this 7th day of November, 2022, based on the foregoing opinion and the opinion of the Court of Common Pleas of Beaver County (C.C.P. Beaver, No. 10676-2021, filed Oct. 25, 2021) (Ross, J.), appended hereto, we AFFIRM the Order of the trial court.

_____
**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY
PENNSYLVANIA
CIVIL DIVISION - LAW

CENTRAL VALLEY SCHOOL DISTRICT,    :

    Petitioner    :

        :

    vs.    :    No. 10676-2021

        :

CENTRAL VALLEY EDUCATION    :
ASSOCIATION, PSEA/NEA,    :

        :

    Respondent    :

## ORDER

AND NOW, this 25th day of October, 2021, upon consideration of the Petition to Vacate the Arbitration Award filed by the Central Valley School District, a review of the record, including the arbitrator's decision of April 16, 2021, the briefs of the parties and the arguments of counsel heard on August 25, 2021,

IT IS HEREBY ORDERED that the decision of the arbitrator is affirmed, and the Petition to Vacate the Arbitration Award is denied for the reasons stated in this Court's Memorandum Opinion entered this same date.

BY THE COURT:



_____ J.

EXHIBIT

A

CENTRAL VALLEY SCHOOL DISTRICT,   :

      Petitioner             :

    vs.                     :     No. 10676-2021

CENTRAL VALLEY EDUCATION     :
ASSOCIATION, PSEA/NEA,         :

      Respondent         :

ROSS, J.                              October 25, 2021

## MEMORANDUM OPINION

## INTRODUCTION

This action involves a petition to vacate an arbitration award filed by the Central Valley School District (hereinafter "Central Valley"), petitioner, against the Central Valley Education Association, PSEA/NEA (hereinafter the "Association"). Rebecca Hall, a member of the Association, was terminated by Central Valley by vote of its school board at the December 5, 2019 board meeting. Ms. Hall, through the assistance of the Association, filed a grievance under the terms of the collective bargaining agreement (hereinafter "CBA") between Central Valley and the Association. In the grievance, the Association alleged that Central Valley violated the CBA by terminating Ms. Hall without "just cause."

An arbitrator, selected through the Pennsylvania Bureau of Mediation, was appointed to hear the case. The hearing was commenced on September 30, 2020 and continued on October 15 and 16, 2020, at which time witnesses were heard and evidence was received by the arbitrator. A transcript of the hearing was prepared, and the parties were afforded the opportunity to provide the arbitrator with post-hearing briefs on January 15, 2021, thereby closing the record.

On April 16, 2021, the arbitrator entered an award, sustaining the grievance and finding that Central Valley dd not have just cause under the CBA to terminate Ms. Hall. The award reinstated her to her position as a teacher and directed that she receive all lost earnings, seniority and benefits.

As stated above, Central Valley has filed a petition to vacate that arbitration award. The Court will address the petition through this Memorandum Opinion.

## FACTS

Ms. Hall was a third-grade teacher for Central Valley at the time of the incident in question. She had been employed by Central Valley, or one of its predecessors, for over 15 years. She had a daughter who attended school within the school district, who was a tenth-grade student at the time of the incident.

The underlying conduct occurred while Ms. Hall was off duty, in the confines of her home with her daughter. The daughter directed a recorded video placed on Tik Tok, in which the mother and daughter both performed. In the video, Ms. Hall and her daughter engage in a 15 second performance to a musical rap song. It was a 15 second video, and Ms. Hall's performance consisted of two appearances during two lines of the song for approximately 7 or 8 seconds of the video. The lyrics of the song contain offensive sexual and racial terms, and Ms. Hall lip-synced a portion of the lyrics, mouthing the "F" word, and engaged in a sexual gesture by rolling her open hand over her crotch area.

The arbitrator found, based upon the testimony, that the video was directed by Ms. Hall's 15 year-old daughter. The daughter asked the mother to engage in the video and taught Ms. Hall the first verse of the song with dance moves to perform. The video was recorded, and Ms. Hall confirmed that she knew the video was being recorded at that time. Ms. Hall advised her daughter not to post the video, but the daughter posted it anyway. Ms. Hall became aware that the video had been posted and instructed her

-2-

daughter to take the video off-line, but the daughter did not do so because she did not believe it was a big deal. The video was viewed by members of the community, who brought it to the attention of school officials.

In his decision, the arbitrator noted that, during the video, Ms. Hall did not identify herself as an employee of Central Valley and wore no clothing or other indicia of association or relationship with the school district. There was no way for a viewer to connect the video with the school district other than personal awareness that Ms. Hall was a teacher.

The arbitrator also found, based upon the testimony and evidence, that Ms. Hall was a willing participant in the video and that she knew it was being recorded. Ms. Hall did instruct her daughter not to post the video, but took no affirmative action to ensure that it was taken down from the posting after she became aware that it was posted.

When Ms. Hall viewed the video, she was "shocked, embarrassed and sickened." The arbitrator stated that "even though this one-time offense involved off-duty misconduct, both parties agree that professional educators are held to a higher standard than the general working public, given the nature of the positions."

The arbitrator heard testimony from various witnesses who viewed the video, including several Central Valley employees. Central Valley presented witnesses concerning the moral standards and values of the community. The witnesses were administrators for Central Valley. They testified that they were disgusted and offended by Ms. Hall's performance on the video and that they were certain that the community would not approve of this behavior. At the same time, the arbitrator noted that school board members would be "a good gauge of the community's morals, as they are elected by the community." The arbitrator further noted that none of the school board directors testified and there was, therefore, no evidence in the form of testimony from the school board to

-3-

indicate that the morals of the community were violated by the conduct on the video. Based upon this, the arbitrator found that "the School District did not provide substantial evidence to prove Ms. Hall's conduct offended the morals of the community." The arbitrator found that immorality was "the crux of this case."

The school district had charged Ms. Hall with immorality, incompetence, intemperance and willful neglect of duties under 24 P.S. §11-1122. The arbitrator found that there was no specific duty identified by Central Valley as a basis for the charges which Ms. Hall willfully neglected. Accordingly, he found no willful neglect of duty. According to the arbitrator, "there is nothing about the video recording that can be compared to the loss of control involving violence, physical contact or intoxication that have previously been recognized as intemperate under Section 1122." Therefore, the arbitrator found no intemperance. As to incompetency, the arbitrator stated that "the one time 15 second video does not represent a continuing or persistent mental or intellectual inability or incapacity to perform the services expected of the Grievant as a professional educator." For that reason, the arbitrator found no basis for incompetency.

As stated, the arbitrator focused attention primarily on the charge of immorality. The arbitrator found that "the School District did not provide substantial evidence to prove Ms. Hall's conduct offended the morals of the community." In the final analysis, the arbitrator stated as follows:

> Thus, in consideration of the fact that the Pennsylvania School Code Section 1122 is to provide the greatest protection possible against dismissal and that the grounds for dismissal must be strictly construed in favor of the professional employee and against the School District, it is found that the School District did not establish just cause for the suspension and termination of Miss Hall. Consequently, the grievance filed on her behalf is sustained. As the remedy in this case, Miss Hall shall be reinstated to her position as a teacher with the School District and all records related to her suspension and termination shall

-4-

be expunged. Miss Hall shall be compensated and made whole for all lost earnings, seniority, and benefits.

As noted above, the arbitrator entered his decision and award on April 16, 2021, directing reinstatement of Ms. Hall and that she be made whole.

Central Valley presented and filed its Petition to Vacate the Arbitration Award on May 17, 2021. In that petition, Central Valley set forth 15 bases for vacation of the award in paragraphs 26 through 40 of its petition. Those grounds for appeal center around contentions that the arbitrator's decision did not reflect a proper interpretation of the CBA; the evidence supported the charges; an alleged incorrect application of the "just cause" definition in the CBA; the arbitration award does not satisfy the essence test; the decision is contrary to law because it creates a new standard of proof of immorality; and that the arbitrator failed to properly apply the statutory provisions of the school code.

Counsel for the parties have briefed the issues and their respective positions. The Court heard arguments of counsel on August 25, 2021.

These are the facts that frame the issues for the Court to decide. The Court may cite and assert additional facts from the record in its legal analysis to follow as needed.

## STANDARD OF REVIEW OF ARBITRATION DECISIONS

Counsel for the parties both agreed that the proper standard for this Court to utilize in addressing the arbitrator's decision is the "essence test." In *Westmoreland Intermediate Unit #7 v. Westmoreland Intermediate Unit #7 Classroom Assistance Educational Support Personnel Association, P.S.E.A./NEA*, 595 Pa. 648, 660-62, 939 A.2d 855, 862-63 (2007) (emphasis in original), the Pennsylvania Supreme Court explained and defined the essence test as follows:

> Acknowledging the value of limited judicial review and the potential injurious nature of a broad scope of judicial review which would undermine the arbitration process, shortly after PERA's enactment, our Court in *Community College of Beaver*

*County v. Community College of Beaver County, Society of Faculty (PSEA/NEA)*, 473 Pa. 576, 375 A.2d 1267 (1977), addressed the proper standard of review by which to review a grievance arbitrator's award. The standard is one characterized by great deference. The arbitrator's award must be "respected by the judiciary if 'the interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention....' " *Id.* at 1275 (*quoting Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir.1969)).

In articulating the proper standard of review under PERA, our Court determined that the standard of review by the judiciary of a grievance arbitrator's award was consistent with federal case law addressing the same issue. As stated by the United States Supreme Court in *United Steelworkers v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960):

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may, of course, look for guidance from many sources, yet **his award is legitimate only so long as it draws its essence from the collective bargaining agreement.**

*Id.* at 596, 80 S.Ct. 1358 (emphasis added). Thus, from *Enterprise Wheel*, we employ the term "essence test." The deferential essence test, as first formally adopted in Pennsylvania in 1977, has been the proper standard of judicial review for the following thirty years.

Recently, in *Cheyney University*, we reaffirmed the essence test and set forth a clear two-prong approach to judicial review of grievance arbitration awards: "First, the court shall determine if the issue as properly defined is within the terms of the collective bargaining agreement. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement." *Cheyney University*, 743 A.2d at 413. We explained: "That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement." *Id.* Regarding a review for reasonableness, we rejected such review, finding that it would invite a reviewing court to substitute its own interpretation of the contract language for that of the arbitrator.

-6-

*Id.* Therefore, we instructed that a court should not engage in merits review of the matter. Indeed, after our reaffirmation of the circumscribed essence test we made it eminently clear that "the essence test does not permit an appellate court to intrude into the domain of the arbitrator and determine whether an award is 'manifestly unreasonable.'" *Pennsylvania Game Commission v. Civil Service Commission (Toth),* 561 Pa.19, 747 A.2d 887, 891 (2000); *see also Greene County v. District 2, United Mine Workers of America,* 578 Pa. 347, 852 A.2d 299, 305 (2004); *Danville Area School District v. Danville Area Education Association,* 562 Pa. 238, 754 A.2d 1255, 1259 (2000). Thus, the circumscribed essence test is the standard of review by which courts will review grievance arbitration awards arising under PERA.

This standard will guide the Court in its legal analysis of this case.

## LEGAL ANALYSIS

The Court begins this analysis by stating that it does not condone or approve of the conduct or Ms. Hall in the video in question. In fact, the arbitrator noted at page 34 of his decision that Ms. Hall stated that when she viewed the video, she was "shocked, embarrassed and sickened." However, that is not the standard that guides this Court in its decision. Moreover, this Court is "prohibited from second-guessing an arbitrator's findings of fact and may not reject them simply because . . . [it] disagree[s] with them." *Rosetree Media Secretaries and Educational Support Personnel Association v. Rosetree Media School District,* 136 A.3d 1069, 1078 (Pa. Cmwlth. 2016); *Bethel Park School District v. Bethel Park Federation of Teachers, Local 1607,* 55 A.3d 154, 159 n.4 (Pa. Cmwlth. 2012), *appeal denied,* 619 Pa. 681 (2013). Instead, under the essence test, "a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement." *Cheyney University v. State College University Professional Association,* 560 Pa. 135, 150, 743 A.2d 405, 413 (1999) (footnotes omitted). As the Pennsylvania Supreme Court stated in *Cheyney,* "[w]e believe that the role for a court reviewing a

-7-

challenge to a labor arbitration award . . . is one of deference." *Id.* at 149, 743 A.2d at 413. "The arbitrator's findings of fact are binding on the courts, and the reviewing court may not undertake any independent factual analysis." *Gateway School District v. Teamsters Local 205*, 181 A.3d 461, 465 (Pa. Cmwlth. 2018). "Furthermore, the court may not generally review the merits or reasonableness of the arbitrator's award as part of the essence test." *Id.* Most importantly, the Court may not substitute its own judgment for that of the arbitrator. *Id; School District of Philadelphia v Commonwealth Association of School Administrators, Teamsters Local 502*, 160 A.3d 928, 933 (Pa. Cmwlth. 2017), *appeal denied*, 643 Pa. 117 (2017). In accordance with these principles, the Court must determine whether the arbitrator's decision here had proper foundation and flowed from the CBA.

The question before the arbitrator was whether there was "just cause" for Ms. Hall's termination. Under the CBA in this case, just cause is defined as follows:

## ARICLE VI
## JUST CAUSE/DISCIPLINE

a. Just Cause

No member of the bargaining unit shall be disciplined, suspended, furloughed, laid off or discharged without just cause Just cause is hereby defined, for matters of discipline, as any employee conduct which violates any Board policy, practice, rule or regulations, is in violation of the employees' responsibilities under the School Code or is behavior which is not permitted under the School Code. Nothing contained in this provision shall limit the Association's right to challenge whether the District has satisfied any of the elements of the just cause standard.

The arbitrator found and determined that there was no district policy, practice, rule or regulation applicable here; therefore, he turned his attention to 24 P.S. §11-1122 of the School Code which sets forth causes for termination of contract. That statutory section provides as follows:

-8-

(a) The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employe shall be immorality; incompetency; unsatisfactory teaching performance based on two (2) consecutive ratings of the employe's teaching performance that are to include classroom observations, not less than four (4) months apart, in which the employe's teaching performance is rated as unsatisfactory; intemperance; cruelty; persistent negligence in the performance of duties; wilful neglect of duties; physical or mental disability as documented by competent medical evidence, which after reasonable accommodation of such disability as required by law substantially interferes with the employe's ability to perform the essential functions of his employment; advocation of or participating in un-American or subversive doctrines; conviction of a felony or acceptance of a guilty plea or nolo contendere therefor; persistent and wilful violation of or failure to comply with school laws of this Commonwealth, including official directives and established policy of the board of directors; on the part of the professional employe: Provided, That boards of school directors may terminate the service of any professional employe who has attained to the age of sixty-two except a professional employe who is a member of the old age and survivors insurance system pursuant to the provisions of the act, approved the first day of June, one thousand nine hundred fifty-six (Pamphlet Laws 1973).[1] In such case the board may terminate the service of any such professional employe at the age of sixty-five or at the age at which the employe becomes eligible to receive full benefits under the Federal Social Security Act.

[Footnote omitted].

Since there were no criminal charges filed and no criminal conduct alleged and since Ms. Hall had no unsatisfactory performance ratings, the arbitrator turned his attention to the applicable provisions of Section 11-1122, which are immorality, incompetency, intemperance and willful neglect of duties.

At page 32 of his decision, citing *Flickinger v. Lebanon School District*, 898 A.2d 62 (Pa. Cmwlth. 2006) and *Williams v. Joint Operating Committee of the Clearfield County Vocational-Technical School*, 824 A.2d 1233 (Pa. Cmwlth. 2003), the arbitrator noted that cases that have addressed this type of conduct as a basis for termination due to willful neglect of duties have involved affirmative work-related duties. None were

-9-

involved here. He also noted that the school district stated no specific affirmative duty in the statement of charges that was willfully neglected. The Court finds no error in this finding.

As to the issue of intemperance, the arbitrator cited the Commonwealth Court decision in *McFerren v. Farrell Area School District*, 993 A.2d 344 (2010), *appeal denied*, 608 Pa. 650 (2010). The *McFerren* Court, relying upon 22 Pa. Code §237.5, defined intemperance as "a loss of self-control or self-restraint, which may result from excessive conduct." *Id.* at 360. The *McFerren* Court noted that "[t]here has never been a case where this Court has upheld a dismissal on grounds of intemperance under Section 1122." *Id.* at 362. The arbitrator found that the conduct of Ms. Hall in connection with the video did not meet the standard for intemperance as defined in *McFerren* and that intemperance was not established by the school district, which this Court agrees with.

As to the issue of incompetency, the arbitrator looked to the definition of that term under the Pennsylvania Code, 22 Pa. Code §237.4, which states that incompetency is "a continuing or persistent mental or intellectual ability or incapacity to perform the services expected of a professional educator or a charter school staff member." The arbitrator reviewed this definition and stated as follows at page 33 of his decision, "[i]n my view, the one time fifteen second video does not represent a continuing or persistent mental or intellectual ability or incapacity to perform the services expected of the Grievant as a professional educator. Moreover, it was not established that Ms. Hall lacks the substantive knowledge of the subject she taught or a lack of ability or desire to teach according to proper methodology." Based upon this, the arbitrator found that the school district did not meet the evidentiary requirements to establish this charge. The Court agrees with this determination.

-10-

This brings the Court to the final issue and determination made by the arbitrator, namely whether Ms. Hall's conduct in the video constituted immorality, which the arbitrator determined was "the crux of this case . . . ." (See arbitrator's decision, p. 33). The Court will now address the findings on immorality.

"To establish immorality, the school district must prove three elements: (1) that the alleged immoral act actually occurred; (2) that the act offends the morals of the community; and (3) that the act sets a bad example for students." *Bonatesta v. Northern Cambria School District*, 48 A.3d 552, 558 (Pa. Cmwlth. 2012); *McFerren*, 993 A.2d at 353-54. As the *McFerren* Court stated, "[i]mmoral conduct is something more serious than unprofessional conduct." 993 A.2d at 354.

At page 35 of his decision, the arbitrator stated that "[i]n this case, it is evident that the alleged immoral act actually occurred. The video, audio and the Grievant's dancing and gestures and the recording represent the alleged immoral act." What the arbitrator wrestled with was the second element, namely whether the act offended the morals of the community. As the *McFerren* Court stated, "[t]he moral standards of the community will not be presumed; they must be proved by substantial evidence." *Id.* at 354. The arbitrator found this second element lacking based upon the evidence presented. As stated, the test is one of substantial evidence, and the *Bonatesta* Court defined substantial evidence as "such relevant evidence that a *reasonable mind* might accept as adequate to support a conclusion." 48 A.3d at 558.

The arbitrator noted that the school district presented witnesses concerning the moral standards and values of the community. These witnesses held administrative positions with the district. The arbitrator noted that testimony by the administrators, without other testimony from the community, was not sufficient. The arbitrator even went so far as to state that it was incumbent upon the district to present testimony by school

-11-

board members to "serve as a good gauge of the community's morals, as they are elected by the community." (See arbitrator's decision, p. 37). This Court does not agree with that conclusion by the arbitrator in that he attempted to partially base his decision on witnesses that were not called as opposed to those who were. Nevertheless, the arbitrator found, at page 38 of his decision, that "it was not proven that the video was widely disseminated in the community." At the same page, he also found that "despite the school district's claim that . . . [the video] could have been saved and re-posted to other social medial platforms, there is no proof that occurred."

At page 34 of his decision, the arbitrator noted that there was no crime involved in this situation. The video was not publicized in the local media and did not cause any controversy in the community. Ms. Hall did not identify herself as a professional employee of the school district, and she wore no clothes or other indicia of being associated with Central Valley. Based upon this, the arbitrator found that viewers could not connect Ms. Hall with the school district or as a teacher unless they personally knew her.

The Court has already defined substantial evidence above. "When performing a substantial evidence analysis, the Court must view the evidence in the light most favorable to the party that prevailed before the factfinder." *Bonatesta*, 48 A.3d at 558. When viewing the evidence under this standard, the Court cannot find fault with the arbitrator's findings and determination here.

The Court is concerned with the inclusion of a racial slur in the content of the video, and the impact of that racial slur on the issue of immorality. The *McFerren* Court addressed this type of situation under an immorality consideration. At 993 A.2d at 355, the *McFerren* Court noted that there is no authority to establish that "any comment with

a racial reference is *per se* offensive to the morals of every community." As the *McFerren* Court went on to say:

> Political correctness should not be confused with morality. McFerren's choice of words was unfortunate, as much for the unnecessary anatomical reference as for the reference to race. It is human nature to say things thoughtlessly, particularly in stressful situations, that are later regretted. Context is also important in evaluating whether speech is offensive. In *Alston v. Unemployment Compensation Board of Review*, 967 A.2d 432, 433 (Pa.Cmwlth.2009), an African–American employee was dismissed, in part, for using "the 'N' word during a conversation with another employee;" the matter was remanded on procedural grounds. McFerren argues that by pointing out the race of the speaker and the addressee, this Court acknowledged in *Alston* that the context in which racial remarks are made should be considered. Regardless of *Alston*, McFerren's point on context is a good one. Certainly, the use of the "N" word conveys a different message when spoken by African–Americans than when spoken by white people. Likewise, McFerren's comment, if made to a white student, might have touched upon morality in the way it did not in Savage's case. Finally, an immoral act generally requires premeditation, as in the commission of a *crimen falsi,* or the distribution of racist materials.

*Id.* at 356. Viewing the racist words in the video, which actually belonged to a rapper and not to Ms. Hall, the Court cannot find that the racist remark in this case constitutes immorality.

In the final analysis, this Court may not generally review the merits or reasonableness of the arbitrator's award as part of the essence test. *Westmoreland Intermediate Unit #7*, 595 Pa. at 661, 939 A.2d at 863. Moreover, as stated, this Court may not substitute its judgment for that of the arbitrator. Rather, this Court's review is limited to whether the award is indisputably and genuinely without foundation in the CBA and does not logically flow from the CBA. *Cheyney University*, 560 Pa. at 149-50, 743 A.2d at 413. In this case, the arbitrator clearly focused upon the definition of just cause in the CBA and upon the charges lodged against Ms. Hall. The Court believes that the

arbitrator's decision is logically based upon the definition of just cause in the CBA and logically flows from that definition.[1] Accordingly, the Court will enter an Order this same date affirming the decision of the arbitrator and denying the petition to vacate his award.

BY THE COURT:

_James J Ross_ J.

BY THE COURT

2021 OCT 25 P 12: 46

JAMES J. ROSS
JUDGE

FILED OR ISSUED
2021 OCT 25 PM 1:30
MICHAEL ROSSI
PROTHONOTARY
BEAVER COUNTY, PA

---

[1] Central Valley also argued that Ms. Hall gave false information by stating in her Gagnon hearing that she did not know that the video was being recorded and later admitted knowledge of the recording. The arbitrator found no merit in this claim, and the Court agrees.